# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 14, 2013

## STATE OF TENNESSEE v. OTIS MELVIN, JR.

**Appeal from the Circuit Court for Perry County**
**No. 2011CR1      Timothy L. Easter, Judge**

---

**No. M2012-02661-CCA-R3-CD - Filed January 23, 2014**

---

The Defendant-Appellant, Otis Melvin, Jr., was convicted by a Perry County jury of theft of property valued at $1,000 or more but less than $10,000, a Class D felony. See T.C.A. §§ 39-14-103, -105 (2010). The trial court denied Melvin's request for judicial diversion and sentenced him as Range I, standard offender to one year in the Department of Correction. The sentence was suspended to two years on supervised probation. Melvin was also ordered to pay $7,022.11 in restitution to the Social Security Administration. On appeal, Melvin argues that the evidence was insufficient to support his conviction and that the trial court abused its discretion in denying him judicial diversion. Upon review, we affirm the theft conviction and the two-year probationary sentence imposed by the trial court. However, we remand the matter for entry of an amended judgment consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded for Entry of Amended Judgment**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, joined.

Vanessa Pettigrew Bryan, District Public Defender; and J. Gregory Burlison, Assistant Public Defender, Murfreesboro, Tennessee, for the Defendant-Appellant, Otis Melvin, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; Kim Helper, District Attorney General; and Stacey B. Edmondson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On February 28, 2011, the Defendant-Appellant, Otis Melvin, Jr., was indicted by the Perry County Grand Jury for one count of theft of property valued at $1,000 or more but less

than $10,000, a Class D felony. See T.C.A. §§ 39-14-103, -105 (2010). The indictment alleged that between December 15, 2009 and June 3, 2010, Melvin intentionally deprived his sister, Dana Mittlestead, of Social Security disability checks valued at over $1,000. On April 18, 2012, the matter proceeded to a two-day jury trial.

**Trial.** Paulette Coward testified that she became familiar with the victim, Dana Mittlestead, through Middle Tennessee Foster Care. After meeting Mittlestead, Coward had discussed respite and foster care with Melvin, Mittlestead's brother. Coward explained that respite care is a State program that provides family caregivers with a temporary break from the daily care of an individual with special needs. She stated that Mittlestead has several issues including spinal bifida, mild intellectual disabilities,[1] cerebral palsy, and an eating disorder. Coward said she first discussed respite care with Melvin in late December 2009. After Middlestead had concluded thirty days of care in her home, Coward also had a long discussion with Melvin about Family Base. Coward explained that, in the Family Base program, she and her husband provide room and board for an individual with special needs as if he or she were a member of the family. Coward testified that Melvin selected Family Base as the appropriate program for Mittlestead after the care ended.

According to Coward, the State requires that the host family receive seventy percent of the monthly Social Security disability check and that the beneficiary should receive thirty percent of the check. Coward said she discussed these expectations with Melvin and that he disagreed with this financial distribution. Coward testified that Melvin said "he couldn't do that" and that "[h]e had to have the money." Ultimately, they agreed that Melvin would send $100 a month because that was what he said he usually spent on Mittlestead per month. Mittlestead lived with the Cowards from late December 2009 to October 23, 2010. Coward identified seven checks that were made out to her and her husband by Melvin on behalf of Mittlestead. The checks had a total value of $589.89 and were written between January 20, 2010 and April 11, 2010. They included a monthly payment of $100 to the Cowards for miscellaneous expenses for February, March and April 2010. The payment for May 2010 was $200. These checks were later admitted into evidence as a collective exhibit. Coward said that while Mittlestead was in her care and while Melvin was the representative payee for Mittlestead, she received only these checks and twenty dollars in cash from him.

Coward testified that Melvin had expressed a desire to improve the property that he had lived in with Mittlestead in order to sell it and then build a duplex for he and his sister

---

[1] Pursuant to a recently adopted rule of the Social Security Administration, we will use the term "intellectual disability" rather than "mental retardation" except in quoted material where we will use the term specifically stated in the quotation. See Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499-01 (Aug. 1, 2013) (to be codified at 20 C.F.R. pt. 404 and 416).

to share. Coward stated that while Mittlestead lived with her and her husband, they paid for all of Mittlestead's living expenses including food, electricity, the home, and most of her clothing. She said she frequently requested money for Mittlestead during scheduled meetings with Melvin. When Coward asked for the thirty percent of the Social Security disability check to which Mittlestead was entitled, Melvin responded that "[h]e couldn't give up the check." Eventually, the Cowards reported the matter to the Social Security Administration (SSA).

On cross-examination, Coward agreed that Melvin had discussed a long term plan to improve properties including a home and some campsites so that a duplex could be built for him and Mittlestead. Melvin had told her that significant repairs were needed and that Mittlestead could stay with the Cowards for as long as she wanted. Coward also acknowledged that she agreed to the $100 monthly payment. Melvin had told her that he would give her more money if he could, for instance, if the improved campgrounds became profitable. She said that Melvin made three monthly payments of $100 and that he paid $200 in the fourth month after they had a meeting in which the Cowards requested thirty percent of the disability benefits check.

Agent Thomas Goldman of the SSA Office of the Inspector General testified that he had worked in his current capacity for a little over three years. After attending the Inspector General's Academy, he was hired for his current position. In the summer of 2010, Agent Goldman received a complaint from Bill Coward regarding the representative payee for Dana Mittlestead. In the course of his investigation, he determined that Mittlestead was receiving $1,272 per month in Social Security Disability Insurance benefits based on her intellectual disability and that Melvin was acting as her representative payee. Agent Goldman explained that a representative payee is appointed by the SSA to oversee the finances of a beneficiary who otherwise could not manage his or her own funds. To serve as a representative payee, a person must fill out an application and answer questions about his or her suitability. Agent Goldman determined that Melvin had appropriately applied and been appointed as a representative payee. He said that representative payees are restricted in their use of the money and must spend it solely for the benefit of the beneficiary rather than for their personal gain. The money should be used for specific needs such as food, clothing, and shelter. Any excess money at the end of the month must be saved in an interest-bearing account and must not be used for anything other than the beneficiary's needs. Agent Goldman stated that representative payees are advised of the restrictions and responsibilities in the initial application. He then read relevant portions of the application form to the jury. In addition to spending restrictions, the application indicated that the representative payee is required to notify the SSA if the beneficiary leaves his or her custody or care, or otherwise changes address. The application was entered as an exhibit without objection.

Agent Goldman testified that, once approved, representative payees receive a SSA pamphlet that provides further guidance and instruction. He identified the document and read relevant portions to the jury. Under the section titled "How you must use monthly benefits", the guide states:

> First, you must make sure the beneficiary's day-to-day needs for food and shelter are met. Then, the money can be used for any of the beneficiary's medical and dental care that is not covered by health insurance, and for personal needs, such as clothing and recreation. If there is money left after you pay for the beneficiary's needs, it must be saved, preferably in an interest-bearing account or U.S. Savings Bond.
>
> If the beneficiary is in a nursing home or other institution, you should use the benefits to pay the usual charges for care. In this case, you should set aside a minimum of $30 each month to be used for the beneficiary's personal needs.

Agent Goldman stated that, generally, a representative payee is not allowed to receive a fee for his or her services unless court-ordered. Under the section titled "Special Purchases," the pamphlet provides, in relevant part:

> Home improvements–You can pay for renovations that make the beneficiary's home safer and more accessible; for example, installing a wheelchair ramp or widening doorways to accommodate a wheelchair.
>
> . . . .
>
> If you are not sure whether it is okay to use the money for a specific item, (for example, paying a bill the beneficiary owed before you became a payee), contact your local Social Security officer before you spend the money.

Agent Goldman said that, in his investigation, he did not find any record of Melvin ever contacting the SSA regarding special purchases. He testified that a representative payee may be named as a custodian of a beneficiary's account and that the beneficiary's funds should never be commingled with the personal funds of the representative payee. He agreed that these issues were addressed in the pamphlet. Finally, Agent Goldman read the portion relating to changes that must be reported to the SSA. The pamphlet provides:

> You need to tell Social Security about any changes that may affect benefit payments. As payee, you are responsible for repaying money you

-4-

received on behalf of the beneficiary if any of the events listed below occur and you do not report them. For example, tell us if: The beneficiary moves[.]

Agent Goldman stated that, based on his investigation, Melvin had not contacted the SSA regarding Mittlestead's move. He said that representative payees are sent an annual accounting form to report exactly how the money was spent. He further explained the procedure in which a representative payee may address errors in the application. Based on bank records involving Mittlestead and Melvin, Agent Goldman ascertained that Bill and Paulette Coward received around $600. During the relevant six-month period, a monthly payment of $1,272 in benefits was made to Melvin on Mittlestead's behalf.[2] The bank records that Agent Goldman reviewed and the SSA representative payee pamphlet were entered into evidence without objection. After reviewing the checks written from Mittlestead's account by Melvin, Agent Goldman determined that "MLEC" was the utility company. However, he was unable to determine what "TDS" or "Ava Equitable" was. There were also payments made to Sam's Club, Citi card, and Lowe's, though Agent Goldman was unable to determine how those items benefitted Mittlestead. He said that the SSA determined that Mittlestead was not physically residing with Melvin when there was a change in the representative payee. Prior to that, SSA was not aware that Mittlestead was living with the Cowards. Agent Goldman said SSA should have been notified and that a change in the representative payee would have been necessary if it was determined that Melvin was not saving the money or paying the Cowards for Mittlestead's care. In reviewing the bank records, Agent Goldman did not find that any money had been saved.

On cross-examination, Agent Goldman agreed that he was a federal agent and that Social Security is a federal program. He further agreed that the disability benefits are federal funds. He was aware that Melvin had made mortgage payments with the money and that some payments were made to home improvement stores. However, he could not determine what items were specifically purchased. Agent Goldman agreed that the SSA pamphlet indicated that the money should be spent in the beneficiary's best interests. However, he disagreed that the representative payee guidelines were open to much interpretation. He said that the two main reasons to contact the SSA are if the representative payee has any questions or if there is any change in the beneficiary's status. He did not believe that the issue of whether someone had moved or not was open to interpretation. Agent Goldman testified that he was unfamiliar with respite care, which would take place pursuant to state guidelines.

---

[2] According to the witness testimony, Melvin received "about $7,200" in benefits for Mittlestead. Our calculations indicate that the amount would be exactly $7,632.

Patricia Holder[3] testified that she is an attorney practicing primarily in Hickman, Lewis, and Perry Counties. She said that the court appointed her to be Mittlestead's representative payee in April 2010 and that the SSA approved the appointment in June 2010. She had also been appointed guardian ad litem for Mittlestead in April 2010. In this capacity, Holder reviewed bank records from when Melvin had control of Mittlestead's account. She said that when she was appointed representative payee in June 2010, she paid the entire amount of $1,272 in monthly benefits toward Mittlestead's care.

On cross-examination, Holder said that from April to June 2010, she received correspondence from Melvin, including a certified letter, some voice mails, and several e-mails. She agreed that she was not Melvin's attorney and that their interests could potentially be at odds. After she had been court-appointed to serve as Mittlestead's representative payee in April 2010, Holder agreed that Melvin was prevented from making further purchases on Mittlestead's behalf from Social Security funds. She also agreed that Melvin had contacted her for the purpose of making certain purchases and payments for Mittlestead. Holder identified an e-mail received from Melvin dated May 27, 2010, which requested that certain bills be paid to benefit Mittlestead. The requested payments included: $200 as a monthly payment to the Cowards for Mittlestead's miscellaneous expenses, $240.45 to be paid to CitiMortgage as Mittlestead's portion of the payment and to prevent foreclosure, $129.66 to be paid to Travelers for home insurance as required by the house loan, $31.69 to TDS to maintain contact with Mittlestead, $179.86 to MLEC or Meriweather Lewis Electric Company, $94 to Lowe's for items bought for Mittlestead's benefit to improve the home and camp lots, a minimum payment of $39 to Sam's Club for a laptop purchased for Mittlestead's use but which would be returned, and $338 for gas used for various reasons to benefit Mittlestead. Holder testified that she did not pay these bills as requested because she did not perceive them to be in Mittlestead's best interest. She agreed that the requested payments were similar to the limited bank records that documented Melvin's previous spending on Mittlestead's behalf. The e-mail was entered into evidence without objection.

On redirect examination, Holder stated that the e-mail dated May 27, 2010 had requested a mortgage payment be made for a property that Mittlestead was not residing in. She identified an e-mail from Melvin dated from September 13, 2010 which requested payment of the same list of bills from the May 2010 e-mail. The CitiMortgage bill totaled $965.47 for past due payments and had to be paid immediately to prevent foreclosure. Holder did not know Melvin's employment status during this time period. The second e-mail was admitted as evidence without objection.

---

[3] The witness is also referred to elsewhere in the record by her maiden name, "Patricia Wilsdorf," as well as "Tish."

The Defendant-Appellant, Otis Melvin, Jr., testified that his family had owned property in Perry County including a house and three campsites. He said his mother purchased the house in 2000 and that she had lived there with Mittlestead and acted as her primary caretaker. In 2001, Melvin moved into the home at his mother's request to help care for Mittlestead. He said his sister had an intellectual disability due to lack of oxygen during birth, spina bifida, general arthritis, and had multiple operations on her feet. After his mother passed away in 2005, Melvin became the conservator and representative payee for his sister. He said the appointment was unopposed and that it was something he wanted to do because it was best for Mittlestead. When his mother passed away, Melvin began making long term plans for himself and his sister which included building a duplex for them to live in. He did not have a definite place in mind but considered Franklin, Fairview, and Nashville. He said the house was not suitable for Mittlestead because she had issues with her feet and with using the stairs. Melvin also said it was not feasible for him to get a job because he could not leave his sister alone at the house. To generate income for the duplex, he decided that he had to lease the various properties the family owned because the market conditions at the time were not favorable to selling the home.

Melvin said that when the Cowards first offered to care for Mittlestead, he was resistant because his grandmother was helping him. After his grandmother became ill, he considered the option of respite care for his sister. When his sister was placed in the Family Base program, Melvin said he and the Cowards agreed that he would send $100 for the first three months and then $200 per month after that. He stated that Mrs. Coward agreed to cover Mittlestead's room and board and that other expenses would be paid for by the State. Melvin said he understood his sister's placement with the Cowards to be temporary and that her permanent address remained at the family home. While his sister was with the Cowards, Melvin focused on repairing and improving the house and three campsites with the goal of leasing them. He said he spent all of his time on researching or actively repairing the properties. Because he lacked formal training, he had to teach himself what repairs were necessary and how to complete them. He consulted other people and viewed renovation programs to educate himself. Melvin identified four photographs from December 29, 2009 and February 1, 2010 that depicted the work he had done improving the camp lots and in a bathroom in the home. The photographs were introduced into evidence without objection. Melvin said he paid for the repairs by credit card and with his sister's funds. As a representative payee, he specifically purchased wallboard, vinyl trim, paint, and sandpaper. He also used his sister's money to pay for the mortgage and the utilities. Melvin said he made these payments to benefit Mittlestead, because she could either return to the house to live in or the property could be sold or leased to generate money for the duplex. He believed all the repairs and purchases he made were appropriate and ultimately in his sister's best interest.

On cross-examination, Melvin agreed that he had inherited the house from his mother and had lived in the property until the utilities were cut off one by one. He said his mother had initially wanted independent living arrangements for his sister and that he began to implement the plan for a duplex after his mother passed away. He said he had focused on a establishing a long term home for his sister while the Cowards were providing her daily needs such as food, toiletries, and clothing. He agreed that Mittlestead received $1,272 per month in benefits and that he was sending the Cowards $100 a month per agreement. He said he gave some money for his sister's immediate needs, and the rest went toward the long term plan. Melvin said he had consulted some women who told him that he could report his sister as living in the house during her entire respite and Family Base placement. He did not report his sister's stay with the Cowards to the SSA because he did not think it was a conflict. He said his goal was to spend the entire benefits check appropriately each month because there was no saving account set up for his sister. In examining the bank records, Melvin said he withdrew $100 on December 28, 2009 so his sister could eat. He said the check to AXA Equitable was for his sister's life insurance. One of the checks to MLEC was for electricity at a campsite. Melvin acknowledged that his sister was not living at the campsite but maintained that the electricity was to improve the property. There was also an electric bill for the house. Melvin said he could claim that his sister lived there even though she was not physically there. He explained that the checks to TDS, or Telephone Directory Service, were to pay the landline phone bill to communicate with his sister. He did not recall what the $360 withdrawal on February 8, 2010 was specifically spent on, but stated that he would have spent the money with the intent of benefitting his sister. The check for $35.43 to Ferrell Gas was also for the house.

Melvin said he was self-employed when he became Mittlestead's conservator and representative payee in 2005. He was leasing the campgrounds at that time. He began making repairs and improvements on the sites to make them more profitable. One of the lots by the river had been leased for $240 a month for two years. Melvin agreed that his sister was not physically residing at the house but disagreed that he was using her money to pay for his living expenses. He said he could not find employment and leave his sister alone at home but agreed that she had been attending day services during the day. Melvin maintained that he could generate more income for the duplex by improving the properties, rather than by finding a job.

On redirect examination, Melvin said he never stole from his sister and that everything he did was in an effort to comply with the representative payee requirements and to benefit Mittlestead. He stated that the house had since been foreclosed and that his sister was no longer living with him.

Based on the above proof, the jury found Melvin guilty of one count of theft as charged and assessed a fine of $5,000.

**Sentencing Hearing.** At the July 11, 2012 sentencing hearing, the presentence report and the application for judicial diversion were admitted into evidence.

Agent Thomas Goldman testified that he determined the amount of restitution owed to the SSA to be $7,022.11. This figure was based on the six-month period from December 2009 to May 2010 when Mittlestead received $1,272 per month in disability benefits. Agent Goldman then subtracted $609.89[4] from the $7,632 total to account for what had been paid to the Cowards. He said the SSA could pay a lump sum in benefits to Mittlestead and that restitution payments should then be made to reimburse the agency. In his investigation, Agent Goldman reviewed SSA wage records from 2002 to 2009 and could not find any documentation that Melvin had been gainfully employed or had paid taxes during this time. He did not check whether Melvin was recently employed.

On cross-examination, Agent Goldman explained that the court would have to first order restitution. Then, the SSA could determine that there had been misconduct at no fault of Mittlestead and pay her a lump sum.

Patricia Holder testified that she currently served as the representative payee for Mittlestead. She said Mittlestead received $1,317 in monthly benefits at this time. Of this amount, $750 to $1100 went toward monthly expenses, and the rest was spent on a prepaid burial arrangements for Mittlestead. She said the funds were not used for anything other than Mittlestead's care. Holder explained that Mittlestead's monthly expenses included household items like cleaning supplies, groceries, her part of rent and utilities, and personal spending money. According to Holder, Mittlestead stated in a phone conversation that she loved her brother and did not want him punished.

On cross-examination, Holder agreed that the expenditures Melvin had requested that she make were consistent with his past spending. She was also aware of his perspective regarding the long term plan to build a duplex. Holder said that Melvin and Mittlestead had inherited the home from their mother, and that Melvin had filed a disclaimer of Mittlestead's interest. She agreed that the home would go into foreclosure if mortgage payments were not made, but she considered many of the home improvement expenditures to solely benefit Melvin since he was living at the house and not providing any income.

---

[4] This total is apparently based on the trial testimony regarding the twenty dollars in cash and the seven checks made to the Cowards in the record.

On redirect examination, Holder elaborated that one month after Melvin had been court-appointed as conservator for his sister, he executed a disclaimer of her interest in her mother's estate. She agreed that Mittlestead had no legal interest in the home for which Melvin was paying the mortgage.

On recross-examination, Holder said the court documents indicated that this disclaimer of interest was executed so Mittlestead would not lose her Medicare benefits. According to Holder, Mittlestead's interest in the estate could have been placed in a special needs trust rather than disclaimed. In her view, Melvin should have turned over Social Security funds after April 2010 when the court ordered him to refrain from spending the money. Holder said communicating with Melvin was difficult. She clarified that there were no records of Melvin spending Social Security funds after April 2010. On further redirect examination, Holder stated that she never received any money from Melvin and that she did not know where the money ended up after April 2010.

In his allocution, Melvin said he did not spend any of his sister's money after April 2010. He had attempted to follow the representative payee guidelines and his actions were always intended to be in Mittlestead's best interest. Melvin expressed regret that his choices resulted in the instant case. He said he was willing to pay restitution if the court ordered it.

At the conclusion of the hearing, the trial court considered the required factors and denied Melvin's request for judicial diversion. The court found that the circumstances of the offense, the deterrence value, and the ends of justice weighed heavily against the granting of diversion. The court stated, in pertinent part:

> The circumstances of this offense weigh[] heavily against diversion. I am satisfied, based upon the proof, that this was an ongoing criminal episode, and I am further satisfied that in his mind the defendant had to know what he was doing was wrongful conduct. He had been given this pamphlet which was entered into exhibit -- and as an exhibit at the trial. He had been told by several folks including the Cowards that he was misusing this money, that this money was to be used for his sister's benefit, and while she was living with them it was supposed to be used in a percentage basis. He determined how much she should receive and not how much the rules and regulations of the SSA required.
>
> He moved his sister to the Cowards without notifying the Social Security Administration that he had done that, and he absolutely knew, I am satisfied, that this money was to be saved after payments to the beneficiaries -- after the beneficiary's needs have been paid, the balance was to be saved and

he misused that in a knowingly and willful and illegal manner, and this was an ongoing thing.

. . . .

Special and general deterrence value, I'm satisfied that weighs heavily against the granting of diversion. I -- I believe that people in the community need to know when you misuse a benefit, particularly, a government benefit in a way that benefits one [whose] benefit was not intended, then all the taxpayers lose and the folks who generally need this benefit lose as well. A message does need to go forth in all of Tennessee, but, particularly, with the counties that I'm familiar with; Hickman, Lewis, and Perry and Williamson, that if you misuse a government benefit then it is not something that will be taken lightly and will not be something that will allow you to receive the largess of no criminal record. So that factor weighs heavily against diversion, and I do not believe that judicial diversion will serve the ends of justice.

Melvin was sentenced as Range I, standard offender to one year in confinement, which was suspended to two years on supervised probation.[5] The trial court also ordered him to pay $7,022.11 in restitution to the SSA "to be paid on a schedule to be determined by the probation officer." The court also set aside the $5,000 fine that the jury imposed. Melvin timely filed a motion for new trial, which the court denied. He then filed a timely notice of appeal.

---

[5] We note, and as the State has pointed out in its brief, that as a Range I, standard offender convicted of a Class D felony, Melvin was subject to a sentence ranging between two and four years. See T.C.A. § 40-35-112(a)(4). In imposing a below-range sentence of one year in confinement, the court stated:

I do find that considering the enhancing and mitigating factors, although there was a sustained intent, I believe, to break the law evidenced by the defendant's conduct in this case, his conduct neither caused nor threaten[ed] serious bodily injury, so I will sentence him to one year as a standard range one offender and then suspend that sentence to a term of two years probation with special conditions. . . .

The State, on appeal, requests that this court remand the matter to the trial court for entry of a corrected judgment reflecting the appropriate within-range sentence. Melvin did not address this issue in his brief. The record does not reflect that the trial court considered Melvin to be an especially mitigated offender pursuant to Tennessee Code Annotated section 40-35-109. Based on the judgment, it is unclear what sentence the trial court intended to impose. Therefore, we affirm Melvin's conviction, and remand the case for entry of an amended judgment reflecting the intended original sentence. To be clear, Melvin's suspended sentence of two years' probation is within-range and appropriate.

-11-

**ANALYSIS**

**I. Sufficiency of the Evidence.** Melvin argues that the evidence is insufficient to sustain his conviction for theft. Specifically, he contends that the State failed to prove that he intended to deprive his sister of her property. The State responds that the evidence presented at trial was sufficient to prove the elements of the offense beyond a reasonable doubt. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable,

313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000).

In this case, Melvin was convicted of theft of Social Security disability checks belonging to Dana Mittlestead. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."[6] T.C.A. § 39-14-103(a). "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Id. § 39-11-106(a)(18). As relevant in this case, the term "deprive" means to "[w]ithhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner" or to "[d]ispose of property or use it or transfer any interest in it under circumstances that make its restoration unlikely[.]" Id. § 39-11-106(a)(8)(A), (C). Theft of property valued at $1,000 or more but less than $10,000 is a Class D felony. Id. § 39-14-105(a)(3).

In challenging the sufficiency of the evidence, Melvin argues that the State failed to prove beyond a reasonable doubt that he intended to deprive his sister of her disability benefits. He maintains that his actions lacked criminal intent and that he was acting on his sister's behalf. To support this claim, Melvin asserts that all purchases were made for Mittlestead's long term benefit. He also points to the fact that he asked his sister's new representative payee, Patricia Holder, to make the same type of payments after he was removed from that role. Melvin argues that, regardless of whether the payments were proper, "what matters is that this was his honest belief that these purchases were necessary,

---

[6] We note that the requisite mental state for theft is "knowingly" and that the element of an "intent to deprive the owner of property" does not constitute "a different mental state indicating a lesser kind of culpability[.]" See State v. Wilson, 211 S.W.3d 714, 722 (Tenn. 2007). Tennessee Code Annotated section 39-11-302(b) provides:

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

T.C.A. § 39-11-302(b).

appropriate, and in his sister's best interest." Accordingly, he asserts that the evidence at trial was legally insufficient to support his theft conviction.

Viewed in the light most favorable to the State, we conclude that the evidence was sufficient to sustain Melvin's conviction for theft. The proof at trial established that Melvin received a pamphlet from the SSA detailing his responsibilities and restrictions as Mittlestead's representative payee. In this capacity, he was required to spend his sister's monthly disability check on her day-to-day needs including food, shelter, clothing, and health care. After the beneficiary's needs are met, any money left over must be saved in an interest-bearing account. As a representative payee, Melvin was also required to contact the SSA if Mittlestead left his custody or otherwise changed her address. The pamphlet further directs the representative payee to contact the SSA if there are any questions. Agent Goldman testified that, based on his investigation, there was no record that Melvin had contacted the SSA regarding special purchases or Mittlestead's move. In the relevant six-month period from December 2009 to May 2010, Melvin received $1,272 per month for a total of $7,632 to spend on Mittlestead's behalf. Bank records reflected that Melvin wrote checks from Mittlestead's account to pay for the mortgage, phone service, and utilities at a home and at campsites that she did not reside in. Payments were also made to Sam's Club, Lowe's, and Ferrell Gas. There was no indication that any of the benefit money had been saved. Melvin testified that he was unemployed at the time because he considered it more profitable to improve the properties than to work. He stated that he used his sister's benefit money for specific purchases such as wallboard, vinyl trim, and sandpaper and that he lacked formal training in home repairs so he consulted others and viewed television programs. The evidence also established that Paulette Coward and her husband only received seven checks and twenty dollars in cash from Melvin while Mittlestead lived with them. Despite her repeated requests for the disability benefits, Coward received a total of $609.89 for Mittlestead's care. While Mittlestead lived with them, the Cowards had paid for all of her living expenses including food, toiletries, electricity, and most of her clothing. The uncontroverted evidence at trial demonstrated that Mittlestead's benefit money was spent toward repairs and the improvement of properties that she was not living in, rather than toward her day-to-day needs. The proof also established that after Patricia Holder was appointed representative payee, all of Mittlestead's benefit money went toward her care.

Based on the evidence, a rational trier of fact could have found beyond a reasonable doubt that Melvin intentionally deprived his sister of her disability benefits in support of a theft conviction. In other words, the evidence was sufficient for a jury to reasonably infer that Melvin had acted with the "conscious objective or desire" to withhold the disability benefits from his sister such that their value substantially diminished and she was prevented from enjoying the benefit money. See T.C.A. § 39-11-106(a)(18), (8)(A). A jury could also reasonably conclude that Melvin used or transferred interest in the money such that its

-14-

restoration was unlikely to Mittlestead. See id. § 39-11-106(a)(8)(C). Although Melvin argues on appeal that he lacked the intent to deprive his sister of her property, this essential element of theft may frequently be established by circumstantial evidence. See State v. Scates, 524 S.W.2d 929, 931 (Tenn. 1975). Here, the jury considered Melvin's explanation of his conduct and rejected it in favor of the prosecution's theory. See Bland, 958 S.W.2d at 659; see also Carruthers, 35 S.W.3d 516, 557-58. Furthermore, the jury was instructed of, and rejected, the defense of ignorance or mistake of fact and concluded that Melvin committed theft beyond a reasonable doubt. It was the prerogative of the jury to evaluate the credibility of the witnesses and to weigh the evidence, and this court will not substitute its inferences for those of the trier of fact. See State v. Ross, 49 S.W.3d 833, 845 (Tenn. 2001) (citing State v. Pike, 978 S.W.2d 904, 914 (Tenn.1998)). We conclude that the evidence was sufficient to sustain Melvin's conviction for theft beyond a reasonable doubt. Accordingly, he is not entitled to relief on this issue.

II. **Denial of Judicial Diversion**. On appeal, Melvin argues that the trial court abused its discretion in denying him judicial diversion. Specifically, he contends that the trial court failed to properly weigh the requisite factors. The State responds that the trial court considered the appropriate factors and properly exercised its discretion when it denied the request for judicial diversion. We agree with the State.

Tennessee Code Annotated section 40-35-313 outlines the requirements for judicial diversion. After a qualified defendant is found guilty, or pleads guilty or nolo contendere, a trial court has the discretion to defer further proceedings and place that defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A). A qualified defendant is defined as a defendant who pleads guilty or nolo contendere to, or is found guilty of, a misdemeanor or a Class C, D, or E felony; is not seeking diversion for a sexual offense or a Class A or Class B felony; and does not have a prior conviction for a felony or a Class A misdemeanor. Id. § 40-35-313(a)(1)(B)(i). Upon the qualified defendant completing a period of probation, the trial court is required to dismiss the proceedings against him or her. Id. § 40-35-313(a)(2). The qualified defendant may then request that the trial court expunge the records from the criminal proceedings. Id. § 40-35-313(b). "Eligibility, however, does not automatically translate into entitlement to judicial diversion." State v. Gretchen Rochowiak, No. E2012-00931-CCA-R3-CD, 2013 WL 1223388, at *2 (Tenn. Crim. App. Mar. 26, 2013) (citing State v. Bonestel, 871 S .W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000)).

Whether to grant or deny a request for judicial diversion lies within the trial court's sound discretion. State v. Harris, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996) (citation omitted). Accordingly, the trial court's decision regarding diversion will not be disturbed on appeal absent an abuse of discretion. State v. Electroplating, Inc., 990 S.W.2d 211, 229

(Tenn. Crim. App. 1998) (citing State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983)). This court will conclude that the trial court did not abuse its discretion if the record contains "'any substantial evidence to support the refusal.'" State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting Hammersley, 650 S.W.2d at 356).

A trial court must consider the following factors in deciding whether a qualified defendant should be granted judicial diversion: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the interests of the public as well as the defendant. Electroplating, Inc., 990 S.W.2d at 229 (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); Bonestel, 871 S.W.2d at 168 (citation omitted). The trial court may consider the following additional factors: "'[the defendant's] attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility and attitude of law enforcement.'" State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993) (quoting State v. Markham, 755 S.W.2d 850, 852-53 (Tenn. Crim. App. 1988) (citations omitted)). A trial court must weigh all of the required factors in determining whether to grant judicial diversion. Electroplating, Inc., 990 S.W.2d at 229 (citing Bonestel, 871 S.W.2d at 168). Finally, this court has previously held that "a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration." State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997) (citing Bonestel, 871 S.W.2d at 168).

Melvin contends that the trial court abused its discretion in denying his request for judicial diversion. He does not argue that the trial court failed to consider all the relevant factors but merely that it failed to properly weigh those factors. Specifically, Melvin argues that, because he acted without criminal intent, the trial court should not have weighed the circumstances of the offense heavily against judicial diversion. Further, he claims that the factors of his social history and his physical and mental health should have been weighed in his favor rather than neutrally. Regarding deterrence, Melvin argues that the court weighed this factor like a blanket policy against diversion when it stated, ". . . if you misuse a government benefit then it is not something that will be taken lightly and will not be something that will allow you to receive the largess of no criminal record." Finally, he maintains that the trial court should have provided reasoning for its statement, "I do not believe that judicial diversion will serve the ends of justice."

Our review of the record shows that trial court considered the appropriate factors and properly denied the request for judicial diversion. Rather than denying diversion without

-16-

explanation, the court considered Melvin's individual case and characteristics and concluded that, despite his eligibility, he was not a proper candidate for diversion. The trial court found that Melvin's conduct in this case evidenced "a sustained intent . . . to break the law[.]" This court has previously held that "the commission of an offense in separate actions over a period of time indicates a sustained intent to violate the law on the part of the appellant[,]" therefore weighing heavily against the granting of judicial diversion. State v. Hazel Gillenwater, No. E2008-01701-CCA-R3-CD, 2009 WL 2393105, at *4 (Tenn. Crim. App. Aug. 6, 2009) (affirming the trial court's denial of judicial diversion where defendant was a public official who falsified the city's computer records to take at least $20,361.98 in collections without authority from 2005 to 2007). In the instant case, we do not find that the trial court abused its discretion in denying diversion because there is ample evidence to support the court's refusal. See Anderson, 857 S.W.2d at 572; see also Electroplating, Inc., 990 S.W.2d at 229 (holding that because the decision to grant judicial diversion is within the sound discretion of the trial court, this court "may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision"). Although Melvin maintains that he always acted in the best interests of his sister, the record reflects that, during the relevant six-month period, he exercised control over $7,632 of Mittlestead's benefit money, and only spent about $609.89 toward her care, despite guidance from a SSA pamphlet and repeated requests from others. Rather than correcting conduct that was reasonably perceived as misuse of disability benefits, Melvin continued to spend his sister's checks on purchases that were unrelated to her day-to-day well-being. According to a SSA investigation, Melvin did not save any of the monthly benefit money, and he did not contact the SSA about special purchases or his sister's stay with the Cowards. After considering the evidence at trial and Melvin's record, the trial court weighed the circumstances of the offense, the deterrence value, and the ends of justice more heavily than the other factors and denied the request for judicial diversion. The trial court noted that "[Melvin] determined how much [Mittlestead] should receive and not how much the rules and regulations of the SSA required." The court found that Melvin "misused [government benefits] in a knowingly and willful and illegal manner, and this was an ongoing thing." The trial court considered and weighed the requisite factors and properly exercised its discretion in denying judicial diversion.

Melvin has failed to show the absence of "any substantial evidence" supporting the trial court's denial of his request for diversion. Anderson, 857 S.W.2d at 572. Rather, we find that there is substantial evidence in the record to support the trial court's refusal. Accordingly, we conclude the trial court did not abuse its discretion, and Melvin is not entitled to relief.[7]

---

[7] Recently, this court has issued varying opinions regarding the applicability of the standard of review adopted in State v. Bise, 380 S.W.3d 682 (Tenn. 2012), and in State v. Caudle, 388 S.W.3d 273 (Tenn. 2012), to our review of judicial diversion. Compare State v. Kiara Tashawn King, No.

(continued...)

**III. Restitution**. Although not raised by either party, we are compelled to note that the trial court erred in failing to specify at the sentencing hearing the payment schedule for the court-ordered restitution. See T.C.A. § 40-35-304(c). Based on the statutory procedure, it is improper to delegate the duty of determining the restitution payment schedule to the probation officer. Accordingly, we affirm the conviction and the two-year probationary sentence but remand the issue of restitution so that the trial court may determine an appropriate payment schedule in accordance with Tennessee Code Annotated section 40-35-304.

## CONCLUSION

After a thorough review, we conclude that the evidence was sufficient to support Melvin's conviction for theft of property valued at $1,000 or more but less than $10,000 and that the trial court did not abuse its discretion in denying judicial diversion. Accordingly, we affirm the conviction and the two-year probationary sentence imposed by the Perry County Circuit Court. However, we remand the matter for entry of an amended judgment reflecting the original sentence that the trial court intended to impose and the appropriate payment schedule for the court-ordered restitution. The judgment of the trial court is affirmed in all other respects.



CAMILLE R. McMULLEN, JUDGE

---

[7](...continued) M2012–00236–CCA–R3–CD, 2013 WL 793588, at *6-7 (Tenn. Crim. App. Mar. 4, 2013), perm. app. granted (Tenn. Aug. 14, 2013), and State v. Lewis Green, No. W2011–02593–CCA–R3–CD, 2013 WL 1282319, at *9 n. 1 (Tenn. Crim. App. Mar. 28, 2013), perm. app. filed, (Tenn. May 29, 2013), with State v. Paresh J. Patel, No. M2012–02130–CCA–R3–CD, 2013 WL 3486944 (Tenn. Crim. App. July 10, 2013) (Tipton, P.J., concurring and dissenting) (Witt, J., concurring), and State v. Shanice L. Dycus, No. M2012-02297-CCA-R3CD, 2013 WL 5371957, at *7 (Tenn. Crim. App. Sept. 25, 2013). We conclude that in the instant case, the trial court properly exercised its discretion under either a Bise or Electroplating, Inc. standard of review.